J-A25021-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| GEISINGER CLINIC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL J. ROGAN, M.D. | : | No. 1989 MDA 2019 |

Appeal from the Order Dated November 7, 2019
In the Court of Common Pleas of Lackawanna County Civil Division at
No(s):  2019 CV 433

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY OLSON, J.:　　　　　**FILED: JANUARY 14, 2021**

Appellant, Geisinger Clinic ("Geisinger"), appeals from the November 7, 2019 order denying its petition for a preliminary injunction.  In its petition, Geisinger sought to enforce its non-compete agreement with Appellee, Michael J. Rogan, M.D. ("Dr. Rogan").  Upon review, we are constrained to dismiss this appeal as moot.

The trial court summarized the relevant facts of this case as follows.

[] Dr. Rogan is a physician who is Board Certified in Internal Medicine, General Pediatrics, and Child Abuse Pediatrics.  [In 1988, Dr. Richard A. Martin, the Medical Director at Geisinger, began recruiting Dr. Rogan for employment.]

***

[On September 8, 1989,] Dr. Martin, in a letter[,] . . . formally offered Dr. Rogan "a position with the Geisinger Medical Group - Scranton as an Associate in Internal Medicine/Pediatrics to commence July 1, 1990."  The aforementioned letter contained the details of employment, including salary and the associated

benefit package. The [offer] letter also enclosed the subject "Practice Agreement[." The "Practice Agreement" included a non-compete agreement, which stated, in relevant part, as follows:

> Acceptance of this position constitutes my understanding and agreement to restrict my practice of medicine, in the event that my employment with Geisinger Clinic is terminated, withdrawn, or results in disqualification, to an area outside of a 25 mile radius extending from such medical office facility designated as the principal site of my medical office practice at the time of such termination. … This restriction shall endure for two years from the date of termination, and shall apply, regardless of the reasons for the termination, disqualification, or withdrawal; whether initiated for reasons of my own or the Geisinger Clinic's.

In addition, the offer letter included] Geisinger's "policy for due process" attached as Exhibit "B." This policy [was] identified as Geisinger['s] Professional Staff Handbook.

\*\*\*

Dr. Rogan read the "Practice Agreement" and signed it. The date of the "Practice Agreement" is October 15, 1989. … Notwithstanding the start date reflected in the "Practice Agreement," Dr. Rogan began his practice with Geisinger in August [] 1990[.]

Dr. Rogan began his practice with Geisinger at the Lake Scranton facility. … After about a year and [one-]half at Lake Scranton, Dr. Rogan and some other physicians were directed to transfer their practices to a newly developed Geisinger facility in West Scranton.

\*\*\*

Dr. Rogan worked at the West Scranton Clinic from 1992 to 2000. … In the year 2000, however, Dr. Rogan returned to the Lake Scranton facility[. …] Dr. Rogan remained at the Lake Scranton facility until 2013 at which time he was transferred to the Mount Pleasant facility, which is also located in Scranton, Pennsylvania. [] Dr. Rogan remained at the Mount Pleasant facility until the date of his termination[.]

[Prior to Dr. Rogan's termination, in] April [] 2018, while practicing at the Mount Pleasant facility, Dr. Rogan experienced

an "uptick" in positive sexually transmitted disease (STD) results in his patients, predominantly results which denoted the presence of trichomoniasis. Dr. Rogan continued to see this "uptick" in May [] 2018 and [] June [] 2018, and communicated his concern to the lab[oratory]. He became extremely concerned when[,] on one day[,] he had five [] positive results, some of which were back to back in examination rooms [one, two, and three] which were predominantly his examinations rooms. Because of the volume and the frequency of the positive test results, Dr. Rogan was concerned over potential contamination of the samples in the lab[oratory].

Upon receipt of Dr. Rogan's [r]eport, Dr. Donna Wolk, Director of Microbiology for Geisinger, investigated Dr. Rogan's complaint for possible contamination in the lab[oratory]. Shortly after July 5, 2018, and after no contamination was found in the lab[oratory], the focus of the investigation became the examination rooms themselves, particularly examination rooms [one, two, and three]. … On July 11, 2018, the lab[oratory] found that there was DNA residue on surfaces in the subject exam rooms. Dr. Wolk recommended that exam rooms [one, two, and three] be taken "off line" and she communicated that to the Operations Manager at [the] Mount Pleasant facility. The subject examination rooms were, in fact, taken off line and a cleaning protocol was later put in place to address the contamination. Dr. Wolk claim[ed] that she notified Dr. Rogan on July 12, 2018 that the subject examination rooms had DNA residue in them.

\*\*\*

On July 12, 2018, prior to Dr. Rogan's arrival, [Kathy] Lloyd[, Geisinger's Associate Vice President for Regional Operations in the Northeast,] was informed that examination rooms [one, two, and three] tested positive for contamination and these rooms were principally assigned to Dr. Rogan and that they were taken "off line." Upon receipt of this information, [] Lloyd contacted Dr. James Hartle, who was the Chair of the Medicine Institute and the Interim Chief Medical Officer for Geisinger. Dr. Hartle told [] Lloyd that there should be no swabs, pap smears, or pelvic exams/testing conducted by Dr. Rogan until the source of this contamination was determined. … [] Lloyd correspondingly told Dr. James McKenna of Dr. Hartle's directive. Dr. McKenna was the Site Lead or the Physician in Charge of the facility itself.

Upon Dr. Rogan's arrival at the Mount Pleasant facility on July 12, 2018, Dr. McKenna and [] Lloyd met with Dr. Rogan and [] Lloyd relayed Dr. Hartle's directive. [Specifically,] Dr. Rogan was told that examination rooms [one, two, and three] were taken "off line" and he was not permitted to do pelvic examinations and/or swabs. As to the identity of the source of the contamination, Dr. Rogan's specimen collection techniques were called into question. Dr. Rogan was visibly upset about the limitation of his practice. Not being able to examine patients fully, Dr. Rogan told Dr. McKenna and [] Lloyd that he would prefer to go home and work at home. … After some further discussions, Dr. Rogan [] stated that he was leaving. [] Lloyd told him "that's your call, but you have a full schedule of patients." Dr. Rogan [then] left[.]

\*\*\*

After Dr. Rogan left the premises, [] Lloyd called or e[lectronically] mailed Dr. Hartle and explained the events of the day. Upon receipt of [] Lloyd's communication, Dr. Hartle called for a "[tele]phone meeting," which occurred later in the day on July 12, 2018. Dr. Hartle, [] Lloyd, [] Becky Miller, Associate [Vice President] in Human Services, Dr. McKenna, and [] Tracey Wolfe, [Vice President] of the Medicine Institute[,] participated in the conversation. It was all agreed that Dr. Rogan "abandoned his job" and that it was a[n offense that subjected Dr. Rogan to termination].

Notwithstanding the events of the previous day, Dr. Rogan reported to the Mount Pleasant facility on July 13, 2018. Upon his arrival, he was directed to meet with Dr. Hartle and others at [Human Resources]. The events of July 12, 2018 were reviewed and it was communicated to Dr. Rogan that he was, in fact, terminated. Dr. Rogan was provided with a document dated July 13, 2018 entitled "Performance Improvement Plan." This [] document constituted Dr. Rogan's formal termination notification.

\*\*\*

Dr. Rogan made a timely review request pursuant to Geisinger's Human Resources Manual Policies 04.445. … Dr. Maloney was appointed to conduct the "Review Process," which occurred on July 27, 2018. … Present at the "Review Process" were Dr. Maloney, Becky Miller, and Dr. [] Rogan. The focus of this [a]ppeal [p]rocess was to determine what had occurred and whether Dr. Rogan left the facility with patients waiting. [Ultimately,] Dr. Rogan's [a]ppeal was denied by Dr. Maloney, who concluded that

Dr. Hartle had the authority to terminate and his decision to terminate was reasonable.

Trial Court Opinion and Order, 11/7/19, at 8-16 (internal citations and footnotes omitted).

Following Dr. Rogan's termination, Geisinger sent him a letter to remind him of the terms of his non-compete agreement. Dr. Rogan, however, "conceded that he . . . practice[ed] medicine," "applied for and . . . exercise[ed] clinical privileges and/or maintain[ed] staff membership[s] at various facilities within the geographical boundaries of the [non-compete agreement]." Trial Court Opinion and Order, 11/7/19, at 1. Specifically, Dr. Rogan, *inter alia*, "opened a Family Practice in South Scranton and . . . practiced medicine, among other places, at Lake Scranton Urgent Care and NEPA Community Health Care." *Id*. at 1-2.

To challenge the non-compete provision in the Practice Agreement, Dr. Rogan, on August 31, 2018, filed a "Praecipe for Writ of Summons against [] Geisinger." Trial Court Opinion, 4/23/19, at 1. On September 12, 2018, Dr. Rogan also filed a motion for special injunctive relief in which he requested that the trial court "(1) schedule a hearing on [Dr.] Rogan's request for permanent injunctive relief under Pa.R.C.P. 1531; (2) declare the 25-mile restriction in his [P]ractice [A]greement unenforceable; (3) enjoin Geisinger from interfering with [Dr.] Rogan's relationship with his patients by 'misleading and requiring' patients to select a new physician at Geisinger; and (4) order Geisinger to provide him his patients' contact information so that he

could contact them directly." ***Rogan v. Geisinger Clinic***, 2019 WL 2305198, at *1 (Pa. Super. Ct. May 29, 2019).

> On September 13, 2018, the aforementioned [motion] was presented to Judge James A. Gibbons[.]  On the same day, Judge Gibbons issued an [o]rder setting a hearing date on [Dr. Rogan's] [i]njunction request for October 19, 2018.  In addition, Judge Gibbons, concerned about the patients that Dr. Rogan treated, directed Geisinger to "refrain from interfering in the physician/patient relationship between [Dr. Rogan] and his existing patients as of July 13, 2018.  Judge Gibbons also directed Geisinger "to provide [Dr. Rogan] with a list[] of patients being treated by [him] as of July 13, 2018[."]  From this [o]rder, [] Geisinger took a timely [a]ppeal.  On September 24, 2018, [this Court] stayed Judge Gibbon's [o]rder pending disposition of the [a]ppeal.[1]

> [Thereafter, on] January 18, 2019, Geisinger filed a [c]omplaint in [the Court of Common Pleas of Lackawanna County] against Dr. Rogan.  [Also, on January 23, 2019, Geisinger filed] a [p]etition for [p]reliminary [i]njunctive [r]elief requesting that [Dr. Rogan] be precluded from practicing medicine within the [25] mile area restriction.

> ***

> [On February 25, 2019, Geisinger] filed an [a]mended [c]omplaint [and a petition for a special injunction].

Trial Court Opinion, 4/23/19, at 2-3 (footnote omitted) (footnote added).

On March 6, 2019, the trial court denied Geisinger's petition for a special injunction pending a hearing initially scheduled for April 9, 2019.  Thereafter, on March 19, 2019, the trial court continued the hearing on Geisinger's preliminary and special injunction.  On June 3 and June 4, 2019, the trial court

---

[1] On May 29, 2019, a panel of this Court vacated the trial court's September 13, 2018 order granting Dr. Rogan's motion for special relief under Pa.R.C.P. 1531 and remanded for further proceedings.  ***See Rogan***, ***supra.***

conducted a hearing on Geisinger's petitions for injunctive relief. Ultimately, on November 7, 2019, the trial court denied Geisinger's petition. In doing so, the trial court found that, "Geisinger failed to comply with the procedural terms of the 'Practice Agreement' and the procedural guidelines of Policy 04.445 in its termination of Dr. Rogan" and that "the [r]estrictive [c]ovenant is unenforceable because of the interests of the public far outweigh the interests of Geisinger." Trial Court Opinion and Order, 11/7/19, at 35. This timely appeal followed.[2]

Geisinger raises the following issues on appeal:

I. Did the trial court err in applying the merits standard in evaluating whether Geisinger [] breached the Practice Agreement and Policy 04.445 in its termination of Dr. Rogan?

II. Did apparently reasonable grounds exist in the [r]ecord to support the trial court's determination that Geisinger [] breached the Practice Agreement and Policy 04.445 in its termination of Dr. Rogan?

III. Did the trial court err and misapply controlling Pennsylvania law in determining that a provision in an employee handbook was binding upon an employer?

IV. Did the trial court err in applying the permanent injunction standard rather than the preliminary injunction standard to its consideration of the competing interests?

_____

[2] Geisinger filed its notice of appeal on December 6, 2019. On December 23, 2019, the trial court entered an order directing Geisinger to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b)(1). Geisinger timely complied. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on February 7, 2020.

V.   Did the trial court err in failing to weigh the interest of Geisinger [] against the public interest in its balance of the competing interests?

VI.   Did apparently reasonable grounds exist in the [r]ecord to support the trial court's conclusion with respect to the public interest[?]

Geisinger's Brief at 3-4.

Before we may address the merits of Geisinger's claims, we must determine whether these issues are properly before us.  Geisinger appealed from the denial of its petition for injunctive relief, which is based on its non-compete agreement with Dr. Rogan.  The non-compete agreement, however, expired on July 13, 2020.  As such, this appeal is moot.

> An issue can become moot during the pendency of an appeal due to an intervening change in the facts of the case or due to an intervening change in the applicable law[.]  In that case, an opinion of this Court is rendered advisory in nature.  An issue before a court is moot if[,] in ruling upon the issue[,] the court cannot enter an order that has any legal force or effect.
>
> * * *
>
> Nevertheless, this Court will decide questions that otherwise have been rendered moot when one or more of the following exceptions to the mootness doctrine apply: 1) the case involves a question of great public importance, 2) the question presented is capable of repetition and apt to elude appellate review, or 3) a party to the controversy will suffer some detriment due to the decision of the trial court.

*Lico, Inc. v. Dougal*, 216 A.3d 1129, 1132 (Pa. Super. 2019), *citing In re. R.D.*, 44 A.3d 657, 680 (Pa. Super. 2012).

Herein, Geisinger appealed from the trial court's order denying its petition for injunctive relief.  In its order, the trial court held that the

- 8 -

non-compete agreement was unenforceable. Notably, the terms of the agreement limit its enforceability to two years after Dr. Rogan left Geisinger's employment. It is undisputed that Dr. Rogan was terminated on July 13, 2018. The non-compete agreement therefore expired on July 13, 2020. Accordingly, Geisinger's "challenge to the denial of injunctive relief that was based only on the enforceability of the non-compete agreement is moot." *Lico, Inc.*, 216 A.3d at 1132.

Further, none of the exceptions to the mootness doctrine apply in the present case. The matter does not involve an issue of public importance as it "is a private dispute revolving around the enforcement of a non-compete agreement in the contract of a single former employee." *Lico, Inc.*, 216 A.3d at 1132. Moreover, "the question of the enforceability of a clause in the employment contract" between Geisinger and Dr. Rogan "will not arise again" because Geisinger no longer employs Dr. Rogan. *Id.* Lastly, Geisinger will not suffer any detriment without this Court's decision. Geisinger "sought injunctive relief to enforce the non-compete agreement, and that agreement has now expired; [Geisinger] cannot enforce the clause now." *Id.* at 1132-1133.

Because the non-compete agreement expired on July 13, 2020, any order entered by this Court would have no force or effect.[3] As such, the issue is moot and we are constrained to dismiss this appeal.

Appeal dismissed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/14/2021

_____

[3] Herein, Geisinger argues that "it would be inequitable to deny relief based upon the expiration of time, where the time elapsed during the pendency of an appeal in the midst of an unprecedented global pandemic, COVID-19." Geisinger's Reply Brief at 6. In light of this claim, Geisinger requests this Court to enforce the non-compete agreement "for the period of time that Dr. Rogan was out of compliance with the terms of the [r]estrictive [c]ovenant." *Id.* at 8. Our Supreme Court previously explained, however, that "[a]n injunction will not be granted to enforce a restrictive covenant when the restrictive period has[,] by its terms[,] expired." *Hayes v. Altman*, 266 A.2d 269, 271 (Pa. 1970). Thus, because the non-compete agreement expired on July 13, 2020, we decline to extend the compliance period contained within the non-compete provision. Geisinger's "remedy for [] breach of the covenant, now that its time period has elapsed, lies in an action of assumpsit for damages or in a proceeding for an accounting[,] not in a decree of specific performance." *Id.* at 272.